# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JOYCE ANITA EASTON,           )     CASE NO. 4:18CV2289

            )

         Plaintiff,         )     JUDGE JAMES S. GWIN

            )

         v.           )     MAGISTRATE JUDGE

            )     JONATHAN D. GREENBERG

ANDREW SAUL,         )

        Commissioner      )

        of Social Security,     )

            )     **REPORT AND**

         Defendant.     )     **RECOMMENDATION**

Plaintiff, Joyce Easton, ("Plaintiff" or "Easton"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further consideration consistent with this opinion.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

## I.   PROCEDURAL HISTORY

In May 2015, Easton  filed an application for DIB and SSI, alleging a disability onset date of September 11, 2010,[2] and claiming she was disabled due to back problems, high blood pressure, blurred vision, arthritis, anxiety, and depression.  (Transcript ("Tr.") 24, 31.)  The applications were denied initially and upon reconsideration, and Easton requested a hearing before an administrative law judge ("ALJ").  (Tr. 129, 144, 163, 180, 211.)

On October 24, 2017, an ALJ held a hearing, during which Easton, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 24.)  On December 27, 2017, the ALJ issued a written decision finding Easton was not disabled.  (Tr. 36.)  The ALJ's decision became final on April 27, 2018, when the Appeals Council declined further review.  (Tr. 6.)

On October 2, 2018,[3] Easton filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 16, 21, 22.) Easton asserts the following assignments of error:

> (1)   The ALJ abused his discretion by not accepting [P]laintiff's prior counsel's submission of evidence on the basis that it was not timely filed.  This is also an error of law requiring remand.  This issue appears to be a case of first impression under the new regulations regarding the 5-day rule.  A[s] such, this is a broad procedural issue that affects the public interest.

> (2)   The ALJ's Decision is not supported by substantial evidence as the ALJ erred by not considering that there was a change in [P]laintiff's impairments once the pedicle screws broke in her back, coupled with her leg and edema problems, her cardiovascular issues and her fatigue.

---

[2] Plaintiff's brief sets forth three possible alleged onset dates: September 11, 2010; January 17, 2014, the day after the ALJ's denial of her 2011 applications; and September 25, 2015, the day she saw her treating physician for an "acute visit."  (Doc. No. 16 at 2.)

[3] The record reflects Easton obtained an extension of time to file for judicial review.  (Tr. 1-4.)

(3)     The ALJ's Decision is not supported by substantial evidence as the ALJ erred
by failing to provide an analysis of the treating source criteria required under
20 C.F.R. § 404.1527, § 416.927 and Social Security Ruling 96-2p.

(Doc. No. 16.)

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Easton was born in May 1971  and was 46 years-old at the time of her administrative hearing

(Tr. 48), making her a "younger" person under social security regulations.  *See* 20 C.F.R. §§

404.1563(c) & 416.963 (c).  She has at least a high school education and is able to communicate in

English.  (Tr. 35.)  She has past relevant work as a certified nurse's aide and caregiver.  (*Id*.)

### B.   Medical Evidence[4]

### 1.   Physical Impairments[5]

In 2011, Easton was diagnosed with spinal stenosis and disc herniation.  She underwent a

back fusion on November 9, 2011, with laminectomy, microdiscectomy, bone extender, and bilateral

pedicle screw fixation.  (Tr. 590, 813-14.)  Easton received "good relief" from her symptoms after

surgery.  (Tr. 411.)

In 2012, Easton complained of low-back pain along with left hip pain and began treating at

a pain clinic.  Treatment included left sacroiliac injections in April 2012 and February 2013.  (Tr.

411, 569-71.)

---

[4] The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' Briefs.

[5] Easton's brief raises arguments solely related to her physical impairments.  Therefore,
in the interest of judicial economy, the Court discusses only the evidence related to
Easton's physical impairments.

On March 11, 2013, Easton underwent a radio frequency ("RF") procedure of her sacroiliac joint. She underwent a second RF procedure on May 24, 2013. (Tr. 405, 410.)

On November 8, 2013, an MRI of Easton's lumbar spine revealed unremarkable post-surgical change and mild degenerative changes. (Tr. 428, 810.)

A December 2013 physical examination at Doctors Pain Clinic revealed exam findings consisting of: (1) pain with palpation of the left sacroiliac joint; (2) decreased low-back range of motion; (3) significant muscle spasm in the low back; (4) intact sensation in the legs; (5) negative straight leg test; (6) full (5/5) strength in all muscle groups; and (7) normal gait. (Tr. 398-401.)

On December 30, 2013, a left hip x-ray revealed mild-to-moderate degenerative change. (Tr. 427.)

In January 2014, Easton underwent a left hip bursa injection at Doctors Pain Clinic. Examination findings included tenderness over the left hip, "grossly normal" strength, no swelling, and non-antalgic gait. (Tr. 394, 396-97.)

On April 3, 2014, Easton saw Dr. Sykes at Doctors Pain Clinic. At this visit, Dr. Sykes noted left calf spasms, mildly antalgic gait, and Easton's use of a cane. Range of motion was limited in all planes. (Tr. 391-93.)

At a follow up visit on April 21, 2014, Easton presented with low back pain radiating into the left hip with aching, shooting, stabbing pain that was aggravated by walking or standing too long, and improved with resting or laying on the right side. Easton "continue[d] to note improved quality of life as well as improved level of function with the current medication regimen." (Tr. 387.)

Positive exam findings at this visit included varicose veins/phlebitis, nervousness/ anxiety, and mild bursa tenderness to palapation on the left hip. (Tr. 387-90.) Dr. Sykes diagnosed Easton

4

with the following: (1) sacroiliitis; (2) post-lumbar laminectomy syndrome; (3) degeneration of lumbar or lumbosacral intervertebral disc; (4) degenerative osteoarthritis, lumbar/lumbosacral; (5) facet syndrome; (6) chronic pain syndrome; (7) obesity, unspecified; (8) depressive disorder, not elsewhere classified; and (9) bursitis of hip.  (Tr. 389.)  Dr. Sykes recommended trigger point injections. (*Id.*)  Easton received a left hip injection during this visit.  (*Id.*)

On April 28, 2014, Easton saw treating physician Timothy J. Goetze, D.O.  His exam findings included normal strength, sensation, reflexes, and coordination, full range of motion in the joints, and no swelling.  He noted that Easton's back pain was improved and she was having "good success" with medication and a back brace.  (Tr. 454-58.)

Easton saw Dr. Goetze again in May, July, and September 2014.  At each of these examinations, Dr. Goetze noted normal exam findings.  (Tr. 448-51, 490-94, 498-500, 503-05.)

On December 29, 2014, Dr. Goetze recorded lumbar flexion to 30º.  (Tr. 483-87.)  He also ordered an x-ray of Easton's spine.  (*Id.*)

A January 2, 2015 x-ray of Easton's spine showed there was no pedicle screw fracture at the L4-5 fusion. The study was unremarkable.  (Tr. 481.)

On March 12, 2015, Easton underwent bilateral lower extremity ultrasound and doppler. This exam resulted in normal findings.  There was no significant major vessel arterial disease in either lower extremity.  (Tr. 478-79.)

During a March 27, 2015 appointment with Dr. Goetze, Easton complained of joint pain, back pain, and muscle aches.  Active lumbar flexion was to 10º.  The treatment records note chronic back pain and bilateral edema.  Dr. Goetze determined Easton's back condition had deteriorated. She was to continue Neurontin, Percocet, and the back brace.  The left leg edema remained

5

unchanged.  Dr. Goetze ordered an MRI and an echocardiogram.  (Tr. 520-23.)

An April 14, 2015 MRI of the lumbar spine showed bilateral pedicle screws present at L4 and L5 creating artifact.  Scar tissue was noted posteriorly about the thecal sac at the L4-5 level.  Minimal annular bulging was present at L3-4 without thecal sac compromise.  Moderate hypertrophic changes of the facets were seen at L3-4 and L5-S1.  The lateral recesses at L3-4 correspond by the hypertrophic[6] facets.  Ligament flavum hypertrophyii was also present at this level.  The impressions from this MRI included post-surgical changes at L4 and L5 as described above, annular bulging at L3-L4, and osteoarthritis of the facets at L3-L4 and L5-S1, and the lateral recesses at L3-L4 were mildly compromised.  (Tr. 173, 516-17, 789-90.)

On April 24, 2015, Easton saw Dr. Goetze for general and cardiovascular complaints of fatigue.  Her back pain was chronic and unchanged.  Easton rated her pain as a 6/10, radiating down her legs.  Dr. Goetze determined her active lumbar flexion to be 10°.  Dr. Goetze instructed Easton to continue with the back brace, Percocet, and NSAIDs.  He increased her dosage of Neurontin.  Her insurance would not cover a TENS unit.  (Tr. 174, 625-29.)

On June 29, 2015, Dr. Goetze completed a State Agency Medical Report form.  Dr. Goetze reported seeing Easton from August 1, 2011 to April 24, 2015.  He opined Easton's diagnoses consisted of chronic back pain from degenerative lumbar spine, stenosis, herniation, hypertension, tobacco use, and obesity.  He described Easton's medical condition as daily, chronic low back pain with radiation into her legs for five years since 2011 that was worse with any movement.  Pertinent findings on clinical examination included tenderness with palpation and any movement since her first

---

[6] Hypertrophy is defined as "excessive development of an organ or part; specifically: increase in bulk (as by thickening of muscle fibers) without multiplication of parts." MERRIAM-WEBSTER MEDICAL DICTIONARY, https://www.merriam-webster.com/medical.

visit in August 2011. Surgical intervention required was an L4-5 fusion.  Easton's daily medications consisted of Percocet, ibuprofen, and Neurontin.  While these medications decreased her pain to make her functional, Easton continued to experience daily pain.  Dr. Goetze noted Easton used a back brace and TENS unit daily and was very compliant with therapy.   Dr. Goetze prescribed therapy.  Easton responded well to therapy, but received a limited decrease in pain with therapy.  (Tr. 574-75.)

Dr. Goetze opined that Easton's medical conditions resulted in the following limitations on her ability to perform sustained work activity:

- Inability to sit, stand, or walk in any consistent manner due to pain;

- Cannot bend over;

- Cannot lift anything over 10 pounds;[7] and

- Requires frequent breaks.

(*Id.*)

On August 3, 2015, Easton saw Dr. Goetze for aching back pain with an intensity of 9/10.  However, Dr. Goetze's examination revealed normal findings and lumbar flexion to 90º.   Her chronic back pain and benign essential hypertension remained unchanged.  Dr. Goetze noted Easton had "moderate relief with [her] current regiment [sic]."  (Tr. 616-20.)

On September 25, 2015, Easton saw Dr. Goetze for an acute visit.  Diagnoses were lumbar spinal stenosis, degenerative disc, lumbar and obesity.  Easton complained of her left three toes being painful for one week and the pain was a 10/10 with burning radiation into her back.  There was no trauma and moderate relief with Percocet. Dr. Goetze's examination showed normal findings except

---

[7] Dr. Goetze may have written the number "1" rather than "10" in this opinion.  (Tr. 575.)

for decreased breath sounds. (Tr. 647-52.)

On November 3, 2015, Dr. Goetze completed a second State Agency Medical Report form. Dr. Goetze explained that Easton underwent a lumbar fusion in 2011 with limited relief. He opined she got no pain relief with NSAIDs, muscle relaxers, or physical therapy. Easton required daily narcotics and Lyrica, which reduced her pain but led to lethargy. Dr. Goetze noted that a neurosurgeon in May 2015 suggested no further surgical intervention. (Tr. 471-72.)

Dr. Goetze opined that Easton's medical conditions resulted in the following limitations on her ability to perform sustained work activity:

- Inability to bend at the waist beyond 15º, although in response to the final question Dr. Goetze opined Easton cannot bend at all;

- Cannot squat;

- Cannot lift anything over 10 pounds; and

- Gets fatigued quickly.

(*Id.*)

As of November 17, 2015, Easton's medical problems included pain in joint involving lower leg, left leg edema, Vitamin D deficiency, lumbar spinal stenosis, degenerative disc disease of the lumbar spine, obesity, other malaise and fatigue, anxiety, depression, benign essential hypertension, and chronic back pain. Prescribed treatment included Percocet, lumbar back brace, baby aspirin, and a hospital bed. (Tr. 645-46.)

On January 27, 2016, Easton saw Dr. Goetze for a medication check. The treatment notes reflect complaints of joint pain, back pain, and arthritis. A physical examination revealed normal findings except for decreased breath sounds. (Tr. 683-88.)

On September 28, 2016, Easton was again referred to Doctors Pain Clinic. Easton

8

complained of low back pain radiating across her low back and into the left lower leg.  She was experiencing continuous pain that was aching, throbbing, tiring, nagging, penetrating, miserable, and unbearable in nature.  Easton rated her pain at a 10 at its worse and 7 at best.  The pain was accompanied by weakness. Nothing relieved her pain and it was aggravated with walking and standing.  Easton's pain impacted her sleep and mood.  Easton did not get pain relief from physical therapy.  She has tried injections and radiofrequencies.  (Tr. 694.)

Dr. Jafri Syed, M.D., conducted a physical exam that revealed paraspinal muscle spasms and tenderness.  Pain was noted with left-sided facet loading of the lumbar spine.  Dr. Syed's assessment included: (1) other intervertebral disc degeneration, lumbar region; (2) spondylosis – lumbar spine; (3) sacroiliitis; (4) post laminectomy syndrome; (5) chronic pain syndrome; and (6) unspecified mononeuropathy.  Dr. Syed diagnosed Easton with lumbar post laminectomy pain syndrome with lumber radiculopathy.  He recommended a series of three caudal epidural steroid injections.  (Tr. 695-97.)

Lumbar x-rays dated October 11, 2016, revealed fractures of the L5 pedicle screws and pseudoarthrosis of the left L5 transverse process.  (Tr. 779.)  A lumbar MRI dated the same day showed minor L3-4 annular bulge and mild to moderate facet arthrosis causing mild bilateral lateral recess narrowing; an L4-5 minor annular bulge with posterior decompression; an L5-S1 minor annular bulge with moderate facet arthrosis; and mild right lateral recess narrowing (encroachment) with mild broad-based foraminal protrusion causing mild contact with the descending right S1 nerve root.  (Tr. 739-40, 780-81.)

Easton considered undergoing a spinal cord stimulator trial, but a psychological test performed on November 21, 2016, determined Easton needed to undergo treatment for depression

9

and anxiety before being psychologically ready for such a trial.  (Tr. 724.)

Treatment notes from a December 6, 2016, office visit with Dr. Goetze showed new diagnoses of insomnia and severe obesity, but removal of problems with pain in the joint involving the lower leg and left leg edema.  (Tr. 730-31.)  Dr. Goetze's physical exam found lumbar flexion to 15º, full range of motion in all joints, normal muscle strength, and no swelling.  (Tr. 734.)

On December 30, 2016, Easton presented to Doctors Pain Clinic for a follow up appointment using a cane for assistance.  While Easton received 75% relief in pain after a caudal steroid injection at an unspecified date, she reported cramps and leg spasms from a second one in mid-December. The treatment records note that Easton received "improved quality of life as well as improved level of function with the current medication regimen."  Positive exam findings included tenderness in the low back and decreased range of motion in the low back.  Provocative maneuvers showed positive lumbar facet load on the right and left.  The physical exam also showed full strength in all muscle groups and stability within normal limits.  (Tr. 756-58.)

In January 2017, Easton again presented to Doctors Pain Clinic with an antalgic gait and using a cane for assistance.  Easton reported "improved function" with opioid medication and 75% pain relief with the first two caudal steroid injections.  Physical examination findings included a positive straight leg raise from a seated position, positive Faber's sign bilaterally, and tenderness in the paraspinals and lumbar region.  Provocative maneuvers showed positive lumbar facet load on the right and left.  (Tr. 751-53.)

At a follow up visit at Doctors Pain Clinic in February 21, 2017, Easton presented with an antalgic gait and was using a cane for assistance.  However, she reported "okay" pain relief and improved function from the injection.  (Tr. 744, 746-47.)

10

C.      **State Agency Reports**

1.      **Physical Impairments**

On August 20, 2015, Easton underwent a consultative examination by Sushil M. Sethi, M.D., the state agency examining physician.  Dr. Sethi noted Easton came with a cane but opined the use of the cane was not obligatory.  Dr. Sethi opined that based on the objective findings, Easton's ability to do work-related physical activities such as sitting, standing, walking, lifting, carrying, and handling objects may be slightly affected.  Dr. Sethi found Easton could sit, stand, and walk 8 hours in an 8-hour shift and carry 20-30 pounds frequently and 40-60 pounds occasionally.  (Tr. 599-605.)

On September 12, 2015, state agency reviewing physician Theresa March, D.O., opined Easton possessed the ability to perform medium work with the following additional limitations: (1) never climb ladders, ropes, or scaffolds; (2) frequently stoop, kneel, crouch, or crawl; (3) frequently climb ramps or stairs; and (4) must avoid all exposure to hazards.  (Tr. 126-28.)

On January 8, 2016, state agency reviewing physician Elizabeth Das, M.D., opined Easton possessed the ability to perform light work with the following additional limitations: no more than occasional climbing, balancing, crawling, stooping, kneeling, or crouching.  (Tr. 160.)

D.   **Hearing Testimony**

During the October 24, 2017 hearing, Easton testified to the following:

- She is 46 years old.  (Tr. 48.)  She last worked in September 2010.  (Tr. 55.)

- She is 5 foot tall and weighs 245 pounds.  (Tr. 48.)  She has gained 20 pounds in the past two years.  (Tr. 48-49.)

- She lives with her husband and 17 year old daughter.  (Tr. 49-50.)  Her husband and daughter do the dishes and the laundry.  (Tr. 59.)  She cooks maybe twice a week, goes shopping maybe once a month, and vacuums once a week. (*Id.*)

- Her back is the condition that most interferes with her ability to work. (Tr. 55-56.) Her pain is "aching dull sometimes" and goes down her back into her left leg. (Tr. 61-62.) The pain is "really bad" on rainy days. (Tr. 61.) She also experiences muscle spasms down the back of her leg and sometimes gets numbness, tingling, and pins and needles affecting her left leg if she sits too long. (Tr. 62.)

- Her back surgery in 2011 relieved the severe pain going down her leg for a year, but then the pain came back. (Tr. 64.)

- The pain has gotten worse since the November 2013 hearing she had before another ALJ on her previous application. (Tr. 64-65.)

- She can sit comfortably for ten minutes before she needs to change positions, and she can stand comfortably for ten minutes before her lower back starts to hurt. (Tr. 65.)

- She can walk maybe ten yards before she starts to get pain in her lower back and hip. (Tr. 65.)

- She uses a cane every day, and has for approximately the past five years. (Tr. 62.)

- She only sleeps for a few hours before her hip starts bothering her and she needs to change positions. She is able to fall back asleep. She does nap during the day. (Tr. 67-68.)

- She sleeps in a hospital bed prescribed by Dr. Goetze. (Tr. 69.)

- She attended ten of her daughter's track meets in the past 12 months (Tr. 50), but was only able to stay for approximately an hour because she could not sit on the hard benches for longer than that. (Tr. 61.)

- She does not have any friends. (Tr. 59.) She visits with her children and grandchildren when they come to visit her. (Tr. 59-60.)

- She used to bowl and go to flea markets, bingo, the casino, and the movies, but became unable to do these things after her back surgery. (Tr. 63-64.)

After swearing in the VE, the ALJ posed the following hypothetical question to the VE:

> [I]f a hypothetical individual with the same age, education and work experience as the claimant, who retains the capacity to perform sedentary work, and will alternate sitting or standing positions for up to two minutes at 30-minute intervals without going off task. Limited to occasional

12

postural except no climbing of ladders, ropes or scaffolds, requires a hand-held assistive device for ambulating only and the [inaudible] upper extremity can be used to lift and carry up to exertional limits.  Must avoid concentrated exposure to extreme cold and heat, concentrated exposure to wetness and humidity.  Concentrated exposure to excessive vibration, concentrated exposure to irritants and chemicals.  All exposure to unprotected heights, hazardous machinery and commercial driving.  This work is limited to simple, routine and repetitive tasks, requiring only a simple decisions [sic] with no fast-paced production requirements and few work place changes.  Must have no interaction with the public and only occasional interaction with co-workers and supervisors.

(Tr. 72-73.)

The VE testified the hypothetical individual would be able to perform representative jobs in the national economy, such as automatic grinding machine operator, dowel inspector, and system surveillance monitor.  (Tr. 73.)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity"

13

at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Easton was insured on her alleged disability onset date, September 11, 2010,[8] and remained insured through December 31, 2015, her date last insured ("DLI").  (Tr. 25.)  Therefore, in order to be entitled to DIB, Easton must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

---

[8] *See* n.2, *supra*.

14

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.  The claimant has not engaged in substantial gainful activity since January 17, 2014, the day after the prior Unfavorable Decision (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: lumbar spine disc bulge, status/post surgery; chronic pain syndrome; sacroillitis; hypertension; obesity; affective disorders; and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) (i.e. is able to occasionally lift and/or carry no more than 10 pounds; frequently lift and/or carry articles like docket files, ledgers, and small tools; stand and/or walk, with normal breaks, for a total of 2 hours in an 8-hour workday; and sit, with normal breaks, for a total of about 6 hours in an 8-hour workday), except the claimant must be allowed to alternate sitting or standing positions for up to two minutes at thirty minute intervals without going off task; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; requires a hand held assistive device for ambulating only and the contralateral upper extremity can be used to lift and carry up to the exertional limits; must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, excessive vibration, chemicals, and irritants, such as fumes, odors, dust, and poorly ventilated areas; must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; is limited to simple, routine, and repetitive tasks, requiring only simple decision, with no fast-paced production requirements and few work place changes; and can have no interaction with the general public and no more than occasional interaction with co-workers and supervisors.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565

15

and 416.965).[9]

7.  The claimant was born on May **, 1971 and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 11, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 24-36.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable

---

[9] The ALJ incorporated the finding from the prior Unfavorable Decision on Easton's previous application.  (Tr. 35.)

16

mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a

17

substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.      Admission of Evidence

In her first assignment of error, Easton maintains the ALJ erred by not admitting additional medical evidence into the record on the ground that the records were not timely under the "5-day rule." (Doc. No. 16 at 17.)  Easton notified the ALJ of outstanding medical records on October 17, 2017 (Tr. 356), and submitted the records themselves on October 23, 2017 – one day before the hearing.[10] (Doc. No. 16-2, Exh. B; Tr. 46.)  The Commissioner maintains the ALJ properly excluded the evidence.[11]

---

[10] Easton focuses her argument regarding her first assignment of error on the proper calculation of the five business days before the hearing pursuant to the 5-day rule and whether the October 17, 2017 letter was timely under the rule.  The Court need not reach that question because the ALJ's decision only addressed the timing of the *submission* of the records on October 23, 2017, not the timing of the October 17, 2017 letter.  (*See* Tr. 24.)

[11] The Commissioner's brief restates the ALJ's conclusions and determines the ALJ properly excluded the evidence.  In the process, the Commissioner first appears to

In December 2016, the Social Security Administration promulgated new regulations regarding the submission of written evidence to an ALJ at the hearing level. *Ensuring Program Uniformity at the Hearing and Appeals Council Levels of the Administrative Review Process*, 81 Fed Reg. 90987-01 (Dec. 16, 2016) (to be codified at 20 CFR Parts 404, 405, and 416). These new regulations contained a "5-Day Requirement," in which a claimant would need to either provide or inform the ALJ of outstanding evidence five business days prior to the scheduled hearing. *Id*. This requirement was created in an effort to promote "the efficiency of [Social Security's] hearing process and allow[] it to work more effectively by ensuring that ALJs have a more complete evidentiary record when they hold hearings." *Id.* This regulation provides, in relevant part:

> (a) When you submit your request for hearing, you should also submit information or evidence as required by § 416.912 or any summary of the evidence to the administrative law judge. Each party must make every effort to ensure that the administrative law judge receives all of the evidence and must inform us about or submit any written evidence, as required in § 416.912, no later than 5 business days before the date of the scheduled hearing. If you do not comply with this requirement, the administrative law judge may decline to consider or obtain the evidence unless the circumstances described in paragraph (b) of this section apply.

20 CFR §416.1435(a).[12] This regulation was effective beginning January 17, 2017, but compliance was not required[13] until May 1, 2017. 81 Fed. Reg. 90987-01 (Dec. 16, 2016).

Following the implementation of this regulation, the Social Security Administration issued Social Security Ruling ("SSR") 17-4p, which reiterated the "5-Day Requirement" as follows:

---

conflate the October 23, 2017 submission and the earlier notification, and then later assumes without any analysis or explanation that the October 17, 2017 notification was untimely. (Doc. No. 21 at 18-19.)

[12] The provision at 20 C.F.R. § 404.935(a) mirrors this regulation.

[13] As Easton's hearing occurred on October 17, 2017, compliance with this regulation was required at the time of her hearing. (Tr. 42.)

19

> At the hearings level, a claimant generally must submit or inform us about written evidence at least 5 business days before the date of his or her scheduled hearing. We adopted this 5-day requirement in December 2016 and implemented it in May 2017, to address unprecedented workload challenges.

SSR 17-4p, 2017 WL 4736894, at *2 (S.S.A. Oct. 4, 2017).  The Social Security Administration also has a similar rule contained within its Hearings, Appeals, and Litigation Law ("HALLEX") manual. *See* HALLEX I-2-6-58 (S.S.A.), 1993 WL 643036 (May 1, 2017); HALLEX I-2-5-13 (S.S.A.), 2015 WL 1735348 (May 1, 2017).  HALLEX is a procedural manual which sets forth the safeguards and procedures for the Administrative Law Judge hearings.  *Robinson v. Barnhart*, 124 Fed. App'x 405, 410 (6th Cir. 2005).

In the decision, the ALJ made the following finding regarding the additional medical records prior counsel[14] sought to have admitted into the record:

> The claimant submitted or informed the [ALJ] about additional written evidence less than five business days before the scheduled hearing date. The undersigned [ALJ] declines to admit this evidence because the requirements of 20 CFR 404.935(b) and 416.1435(b) are not met. Specifically, the claimant's representative *submitted additional records* from the claimant's primary care physician *one day prior* to the hearing and she made no argument that any of the above exceptions applied to the 5-day rule.  As such, those records are not admitted.

(Tr. 24) (emphasis added).

The Court finds the ALJ did not properly apply 20 C.F.R. §§ 404.935 and 416.1435, and erred in not admitting the additional records from Easton's treating physician's office.  As discussed *supra*, 20 C.F.R. §§ 404.935(a) and 416.1435(a) require a claimant to *inform* or submit any written evidence to the ALJ no later than 5 business days before the date of the scheduled hearing.  20 C.F.R.

---

[14] Counsel representing Easton in her case on judicial review did not represent Easton at the hearing level.

§416.1435(a).  In this case, Easton notified the ALJ of the additional records on October 17, 2017, seven (7) days before the hearing.  The records were submitted one (1) day before the hearing.  The ALJ erred in focusing solely on the timing of the *actual submission* of the records and Easton's failure to make a showing under the 5-day rule exceptions when he excluded this additional evidence from the record.  *See* HALLEX I-2-5-13 ("If a claimant or appointed representative informs SSA about evidence no later than five business days before the scheduled hearing date . . . the ALJ *will accept and consider the evidence* when it is received.") (emphasis added).  *See also* HALLEX I-2-6-58 ("If a claimant or appointed representative informs an ALJ about evidence at least five business days before the date of the scheduled hearing, but does not submit the evidence at least five business days before the date of the scheduled hearing, the ALJ will . . . consider the evidence *regardless of whether the circumstances in 20 CFR 404.935(b) and 416.1435(b) apply*.") (emphasis added.).

When the Social Security Administration does not follow its own regulations, "reversal is required unless the legal error is harmless."  *Wagner v. Comm'r of Soc. Sec.*, 2018 WL 1449150, at *8 (N.D. Ohio Mar. 23. 2018).  Indeed, even if an ALJ decision is supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Bowen*, 478 F.3d at 746.  *See also Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 822 (N.D. Ohio Sept. 28, 2009) ("Because the ALJ failed to follow procedural regulations designed to protect Winning, this Court reverses the ALJ's decision.").

Here, the ALJ's error was not harmless.  These records are from treating physician Dr.

21

Goetze's office and include additional treatment notes of Dr. Goetze.[15]  As Easton points out, these records show right arm and shoulder problems, lumbar flexion to 15º, a weight of 253 pounds, and a BMI of almost 50.[16]  (Doc. No. 16 at 20; Doc. No. 16-2, Exh. B at 8-13.)  The Commissioner asserts that "nothing in the records would likely change either the ALJ's RFC finding or his ultimate conclusion of non-disability."  (Doc. No. 21 at 19.)   While the evidence in these records is mixed, it is not for the Commissioner – or the Court – to weigh this evidence in the first instance.  Suffice it to say, the evidence is relevant, the records came from Easton's primary care physician's office, the records span an eight-month period of time leading up to the hearing, and are not duplicative of evidence already in the record. (Doc. No. 16-2, Exh. B.) Even the Commissioner cannot definitively say these records would *not* change the RFC finding or the ALJ's disability determination.

In sum, the ALJ failed to comply with the Social Security Administration's own regulations regarding the admission of evidence and his failure to comply with these regulations does not constitute harmless error.   Accordingly, the Court should find remand is necessary, thereby affording the ALJ an opportunity to admit this additional evidence into the record and consider it when reaching his decision.

---

[15] While the bulk of this additional evidence consists of mental health treatment records, the mental health records do include relevant information concerning Easton's pain and physical impairments. (Doc. No. 16-2, Exh. B.)

[16] The Court finds counsel's argument in the reply brief that the Court cannot consider these additional records – records counsel attached to the opening brief and discussed in detail in the opening brief to support the argument that these records should have been admitted – as part of a harmless error analysis unpersuasive.  (Doc. No. 22 at 3.)  And while *Foster v. Halter*, 279 F.3d 348 (6th 2001), is distinguishable, it bears mentioning that the Sixth Circuit considered the record at issue in its analysis of whether the lower court erred.  *Id.* at 357-58 ("Furthermore, even if Foster had demonstrated "just cause" for the delay, Dr. Lewis based her diagnosis of mental retardation solely on Foster's IQ scores and made no reference to Foster's school records or work history.").

**B.**      **Necessity for ALJ to Call a Medical Expert**

In her second assignment of error, Easton maintains the ALJ should have called a medical expert ("ME") to: (1) determine when the pedicle screws in Easton's back broke; (2) advise the ALJ as to the type of pain a person would experience with broken pedicle screws; (3) explain Easton's medical conditions to the ALJ and indicate the limitations that would be imposed by Easton's combination of impairments; and (4) advise the ALJ "regarding how [Easton's] medical conditions relate to all of the . . . bullet points" set forth in HALLEX I-2-5-34, which identifies criteria regarding when an ALJ *may* call an ME.[17]  (Doc. No. 16 at 20-23.)  Easton makes no argument that the ALJ erred in his subjective symptom evaluation.[18]

The Court rejects this argument.  "An administrative law judge's determination of whether a medical expert is necessary is inherently a discretionary decision." *Ruby v. Colvin*, No. 2:13-cv-01254, 2014 WL 5782930, at *13 (S.D. Ohio Nov. 6, 2014).  *See also Simpson v. Comm'r of Soc. Sec.*, 344 Fed. App'x 181, 189 (6th Cir. 2009) (unreported); *Foster*, 279 F.3d at 355 (finding an ALJ has the "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."); *O'Neill v. Colvin*, No. 1:13CV867, 2014 WL 3510982, at *18 (N.D. Ohio July 9, 2014) ("ALJs retain discretion as to whether to call a medical expert"); *Slack v. Astrue*, No. 1:08CV2380, 2010 WL 420022, at *3 (N.D. Ohio Jan. 29, 2010) (stating that "the decision use a medical expert is discretionary").  Indeed, SSA regulations expressly give an ALJ discretion to

---

[17] Easton makes no argument that any of the HALLEX provisions mandating the use of a medical expert are present in this case.  (*See* Doc. No. 16 at 20-23.)

[18] The Commissioner's brief fails to respond to Easton's argument that an ME was necessary, instead focusing on the objective medical evidence that supported the RFC and the lack of error in the ALJ's subjective symptom evaluation.  (Doc. No. 21 at 9-11, 15-18.)

23

determine whether to consult a medical expert.  *See* 20 C.F.R. §§ 404.1527(e)(2) (iii), 416.927(e)(2)(iii) (An ALJ "*may* ... ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment") (emphasis added).  An ALJ abuses his discretion only when the testimony of a medical expert is "'required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations.  *See* 20 C.F.R. § 416.1444.'"  *Ruby*, 2014 WL 5782930, at *13 (quoting *Haywood v. Sullivan*, 888 F.2d 1463, 1467–68 (5th Cir. 1989)).

The ALJ's responsibility is to evaluate the evidence, including a claimant's subjective symptoms, and consider the combined effect of a claimant's severe and non-severe impairments in formulating the RFC.   Here, Easton has not demonstrated the ALJ abused his discretion in failing to call an ME.  As discussed at length above, the record contains both medical and opinion evidence regarding Easton's severe impairments during the relevant time period.  Easton has not sufficiently explained why an ME was necessary to evaluate this evidence or to otherwise conduct a full inquiry into her allegations of disability.

## C.      Treating Source Opinions

In her third assignment of error, Easton maintains the ALJ improperly evaluated the opinions of her treating physician, Dr. Goetze.  (Doc. No. 16 at 23-24.)  It appears Easton is asserting that the ALJ failed to give "good reasons" for discounting Dr. Goetze's opinions; Easton argues, "The ALJ's entire basis of not giving controlling weight to the treating physician's statements is evidence before September 2015 and the ALJ's 'medical opinion' that the lumbar MRI of 2016 supports some worsening of Ms. Easton's lumbar impairments, but not until recently and not to a significant degree."  (*Id.* at 24.)

The Commissioner maintains the ALJ properly evaluated the medical opinion evidence.

24

(Doc. No. 21 at 13-14.)   He notes that Dr. Goetze is a primary care physician, not a specialist, and that the ALJ found Dr. Goetze's opinions were inconsistent with his "rather benign" treatment notes. (*Id.*)  The Commissioner also argues Dr. Goetze failed to support his opinions with "any explanation or information," and that the opinions are inconsistent with each other, detracting from their reliability.  (Tr. 14.)  Finally, the Commissioner asserts that Dr. Goetze's November 2015 opinion regarding bending and lifting is consistent with the ALJ's RFC finding.  (*Id.*)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart,* 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96–6p,[19] 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

---

[19]  SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).[20]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[21]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

---

[20] Revised versions of these regulations took effect on March 27, 2017, and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[21] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

26

medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id*. (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406. Moreover, the "treating physician rule" only applies to *medical opinions*.  "If the treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors— [the ALJ] decision need only 'explain the consideration given to the treating source's opinion.'"  *Johnson v. Comm'r of Soc. Sec.*, 535 Fed. App'x 498, 505 (6th Cir. 2013).  The opinion, however, "is not entitled to any particular weight."  *Turner*, 381 Fed. App'x at 493.  *See also Curler v. Comm'r of Soc. Sec.,* 561 Fed. App'x 464, 471 (6th Cir. 2014).

The ALJ weighed Dr. Goetze's opinion as follows:

> Lastly, the treating source statements of Dr. Timothy Goetze, M.D. are accorded little weight (Exhibit B6F and B11F).  While he is a treating source, his opinion that the claimant cannot sit, stand, or walk in any consistent manner, cannot lift any more than 1 pound, cannot bend, and requires frequent breaks is unsupported and inconsistent with the record. Indeed, with the exception of a limited lumbar flexion, Dr. Goetze's physical examination of the claimant are rather benign, in that they show the claimant to be well appearing and in no acute distress, with intact strength, intact reflexes, and intact sensations.  These findings do not support such restrictive limitations.

(Tr. 34.)

As an initial matter, the ALJ fails to cite or direct the reader to the specific treatment notes he references to support his reasoning that Dr. Goetze's opinions are unsupported and inconsistent with the record.  Moreover, many of the treatment notes in the record contain positive findings relating to Easton's back and hip pain and impairments.  Even if Dr. Goetze's own treatment records contain only "occasional" limited lumbar flexion, as discussed in detail above, the overall record is replete with positive exam findings.

The ALJ does not sufficiently explain how, in light of the above evidence, the medical evidence of record supports affording Dr. Goetze's opinions "little" weight.  The Sixth Circuit has made clear that an ALJ's conclusory and unexplained statement that a treating physician opinion is inconsistent with the medical evidence of record does not constitute a "good reason" for purposes of a rejecting an opinion.  *See, e.g., Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245–46 (6th Cir. 2007) (finding an ALJ failed to give "good

28

reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Bartolome v. Comm'r of Soc. Sec*., 2011 WL 5920928 (W.D. Mich. Nov. 28, 2011) (noting that merely citing to "the evidence" and referring to the appropriate regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue*, 2010 WL 2232309 (N.D. Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance.").

A review of the decision reveals at Step Four the ALJ devoted a total of three *paragraphs* to review several hundred pages of medical records concerning Easton's physical limitations.  (Tr. 31-32.)  Within this scant discussion of the medical evidence, the ALJ overlooked all references to Easton's anatalgic gait, and by lumping all of the medical evidence into these three paragraphs glosses over the consistent reports of pain and positive findings in the treatment notes over the course of several years.

Had the ALJ provided a more detailed discussion of the treatment notes prior to weighing Dr. Goetze's opinion, this Court would have been able to conduct a meaningful appellate review. However, the ALJ did not provide a comprehensive discussion of the evidence, and in fact, ignored several important pieces of medical evidence that do not support his conclusion.  The ALJ cannot cure a deficient explanation by simply reciting some of the evidence, and then follow it with an unexplained conclusion that the treating source opinion is inconsistent with the evidence.  *Boughter v. Colvin,* No. 1:16CV733, 2016 WL 7670046, at *19 (N.D. Ohio Dec. 12, 2016).  *See also Sacks v. Colvin*, No. 2:15-cv-2315, 2016 WL 1085381, at * 5 (S.D. Ohio March 21, 2016) ("[A]lthough

the ALJ made a general statement about inconsistencies between Dr. Bhatia's opinions and the 'medical evidence of record,' it was just that-a general statement devoid of any specific reference to any portion of the medical evidence. Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies.").

Furthermore, the Court previously recommended finding the ALJ erred in his exclusion of additional medical records.  These records contain treatment notes from Dr. Goetze's office, and include additional office visits with Dr. Goetze.  It is possible that consideration of these notes may change the weight assigned to Dr. Goetze's opinions, the ALJ's RFC determination, or both. Regardless, the ALJ should be free to consider these additional records and their potential affect on the evaluation of Easton's disability claims without any restriction imposed by this Court.

Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Dr. Goetze.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further consideration consistent with this opinion.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: September 9, 2019

30

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).